IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JOSEPH RAY JORDAN,

          **Plaintiff,**

v.

          **Case No. 18-cv-1100-NJR**

UNITED STATES OF AMERICA,

          **Defendant.**

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Joseph Ray Jordan, an inmate of the Federal Bureau of Prisons ("BOP") who is currently incarcerated at the Federal Correctional Institution in Butner, North Carolina ("FCI – Butner"), brings this action for alleged violations of his federal rights while he was incarcerated at the United States Penitentiary in Marion, Illinois ("USP-Marion"). Jordan was allowed to proceed on a single claim in his lawsuit against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, *et seq.*

Jordan alleges staff at USP-Marion failed to protect him from an assault by another inmate. He also alleges that staff were negligent in placing him in the Special Housing Unit ("SHU") after surgery on his jaw, which was broken in the assault. This matter is now before the Court on a motion for summary judgment filed by the United States.

BACKGROUND

### A. Procedural Background

The pending motion for summary judgment has a long, complicated procedural history. After the United States filed its motion (Doc. 137), Jordan, through assigned counsel, filed a response (Docs. 140, 141). The United States filed a reply brief (Doc. 142).

Jordan then filed a *pro se* affidavit in support of the response that was stricken because he was represented by counsel (Docs. 143, 144). Jordan's counsel then filed the affidavit on behalf of Jordan (Doc. 145). Jordan next filed a supplemental affidavit (Doc. 146) and a motion expressing concern with his assigned counsel's response and representation in the case (Doc. 147).

After a hearing on Jordan's motion regarding his assigned counsel (Doc. 149), the Court allowed assigned counsel to withdraw and granted Jordan leave to file a *pro se* supplemental response (*Id.*). After several extensions of time and motions regarding Jordan's access to discovery, Jordan finally filed his *pro se* response in April 2023 (Doc. 192). Jordan also filed a submission of exhibits (Doc. 189), a notice (Doc. 191), a supplemental affidavit (Doc. 194), a motion requesting the Court accept his "oversized" filing (Doc. 190), a cross motion for summary judgment (Doc. 193), and a notice with request for Court action (Doc. 195). To the extent Jordan requests the Court accept his oversized response (Doc. 192) and exhibits (Doc. 189), the motion (Doc. 190) is **GRANTED**.

The United States filed a reply to Jordan's *pro se* response to its motion (Doc. 196). Jordan sought leave to file a sur-reply to the United States's reply brief, but the Court

denied his request (Doc. 200). Jordan subsequently filed a verified notice regarding, and reply to, the United States's reply brief (Doc. 203). Although not technically styled as a sur-reply, the "notice" is clearly an attempt by Jordan to file the sur-reply previously denied by the Court. To the extent Jordan seeks to file a sur-reply, the "notice" is stricken (Doc. 203).[1]

### 1. Cross Motion for Summary Judgment (Doc. 193)

In addition to his responsive brief, Jordan filed a cross motion for summary judgment (Doc. 193). The deadline for submitting a dispositive motion was April 15, 2022 (Doc. 136). As mentioned above, Jordan was granted leave to file a supplemental response to Defendant's motion for summary judgment (Doc. 149). At no point did the Court grant Jordan leave to file a dispositive motion of his own (Docs. 155, 163, 166, 172, 179, 182, 185). Jordan did previously request an extension of time to file his own summary judgment motion, but the Court denied the request—noting that the dispositive motion deadline had long since passed (Doc. 180). The deadline to file a dispositive motion was never extended, nor was Jordan granted leave to file a dispositive motion. Although Jordan argues that he believed a cross motion would have been deemed timely when he was granted an opportunity to remedy any shortcomings by his counsel (Doc. 203, p. 5), he is mistaken. The Court was clear that Jordan was granted time to file a supplemental response, not his own dispositive motion. Thus, his cross motion for summary judgment is untimely. As a result, Jordan's cross motion for summary judgment (Doc. 193) is

---

[1] To the extent his "notice" argues that his cross motion for summary judgment should be considered timely filed, the Court will consider the argument in reviewing the cross motion.

**STRICKEN** from the docket as improperly filed.

> 2. *Notice and Request for Court Action (Doc. 195)*

After submitting his responsive brief, Jordan filed another document, a "notice and request for appropriate action." His "notice" states his objection to the nondisclosure of, and the lack of access to, admissible evidence that is in the possession and control of the United States (Doc. 195). In essence, Jordan seeks to rehash previous discovery orders in this case and to conduct additional discovery. He requests various BOP records that were previously requested, as well as documents that Jordan alleges his previous counsel neglected to seek despite requests from Jordan to do so (*Id*. at pp. 9-10). This includes depositions of several employees, guards, and BOP experts that Jordan asked to depose, but that assigned counsel chose not to depose—over Jordan's objections (*Id*. at p. 10). In a footnote in his motion, Jordan also seeks the reconsideration of all previous Orders the Court issued related to his access to discovery (Doc. 195, p. 1).

Jordan, once again, requests that the Court re-open discovery and allow him to seek additional documents that he believes are relevant to his claims. He also seeks to rehash all discovery issues previously addressed by this Court. Discovery in this case has long since closed. Further, the Court has addressed Jordan's issues with discovery and denied previous requests to reconsider those Orders (Docs. 172, 179, 180). The summary judgment motion has now been fully briefed. The Court denies Jordan's request to once again re-open and allow for additional discovery.

### B. Factual Background

#### 1. The Communications Management Unit

At the time of the events in his lawsuit, Jordan was housed in the Communications Management Unit ("CMU") at USP-Marion (Doc. 137-1, p. 1). Kathy Hill, the Intelligence Research Specialist ("IRS") for the CMU at USP-Marion, attested in an affidavit that the CMU is a self-contained general population housing unit that allows for more effective monitoring of communications between inmates in the unit and the community (*Id.* at p. 2). The unit was established "to house inmates who, due to their current offense of conviction, offense conduct, or other verified information, require increased monitoring of communications with persons in the community." (*Id.* at p. 7). The unit itself has more guards than a regular unit (Doc. 140-2, pp. 26-27). There are also different security level inmates in the unit (Doc. 140-1, pp. 32-33).

Inmates are designated to the unit in accordance with BOP Program Statement ("PS") 5214.02, *Communications Management Units* (Doc. 137-1, pp. 6-19) The criteria by which an inmate may be designated to the CMU is found in 28 C.F.R. § 540.201 and PS 5214.02 (*Id.* at p. 2, 6). The BOP's Counter Terrorism Unit ("CTU") assesses the information prescribed by PS 5214.02, reviewing the inmate's current offense of conviction, his likelihood of contacting victims, whether he committed prohibited activity related to misuse of approved communication methods, and any protentional threat to the safe, secure, and orderly operation of prison facilities as a result of communications (*Id.* at p. 8-9). The referral is then sent to BOP's Office of General Counsel who reviews the referral and sends it back to the CTU to be forwarded to the Assistant Director,

Correctional Programs Division (*Id*.). The Assistant Director has the authority to approve the designation to the CMU (*Id*. at pp. 2, 9). Jordan was designated to the CMU prior to the promulgation of 28 C.F.R. § 540.200, *et seq*., but the designation criteria and process is identical to the criteria used when Jordan was designated to the CMU, except that final approval authority was given to the Regional Director of the North Central Regional Office instead of the Assistant Director of the Correctional Programs Division (*Id*. at p. 2).

Jordan was designated, in part, because his conviction involved threatening communications (Doc. 140-2, p. 23; Doc. 137-1, pp. 22).

### 2. *The Assault*

On December 10, 2014, Jordan was assaulted by Inmate Menter. Portions of the assault were captured on surveillance video (Doc. 137, Exhibit H, submitted video footage). Inmate Menter approached Jordan's cell and stated, "I'm here to fight" and tried to come into Jordan's cell (Doc. 137-2, p. 26). Jordan struggled to keep Menter out of the cell. Menter then walked away and went to the mop closet (*Id*. at pp. 26-27; Doc. 137-1, p. 25). Menter returned to Jordan's cell with a weapon, and the two inmates again struggled inside the cell (*Id*. at p. 27; Doc. 137-1, p. 25; Exhibit H). During the struggle, Jordan fell into a concrete shelf, breaking his jaw (Doc. 137-2, p. 28; Doc. 137-1, p. 25). The two inmates fell to the ground, and Menter left the cell (*Id*.). During the assault, two other inmates walked up and stood directly outside of Jordan's cell (Doc. 137, Exhibit H).

Jordan testified that he did not know the catalyst for Menter's assault (Doc. 137-2, p. 33). Jordan testified that the Muslim inmates in the unit thought that he did not like Muslims based on prior statements (*Id*. at pp. 32-40). He also had a son in the Army and

spoke about him to other inmates (*Id.* at p. 35). He recalled an earlier interaction with Inmate Shnewer, one of the inmates Jordan testified was standing outside of the cell during the attack, which occurred the year of—or a couple of years before—the assault (*Id.* at pp. 36-39). He also recalled learning at some point that Shnewer had asked that Jordan be removed from the unit (*Id.* at p. 36, 39). But Jordan did not recall any previous interactions with Menter. Jordan testified, however, that he believed Shnewer directed Menter in the assault (*Id.* at pp. 32-40). He acknowledged that no one told him Shnewer directed the assault, and his beliefs were based on assumptions (*Id.* at p. 39-41). He ultimately testified that he did not know the reason for the attack (*Id.* at p. 42).

Jordan previously wrote several copouts (complaints) prior to the assault about Muslim inmates improperly taking non-Muslim, non-flesh eater's meal trays (Doc. 137-1, pp. 29-69). Jordan's December 2013 copout stated that he was complaining "for the umpteenth time" about there not being enough "no-flesh" meals for the unit because inmates who were not on the diet were taking the meals (*Id.* at p. 54). Jordan indicated that he believed the problem was "likely to boil over" because he had seen several fights between inmates trying to pick another inmate's tray (*Id.*). He often complained about inmates taking items and trays from the "no-flesh" meals, noting that Muslim inmates often took desirable items from the "no-flesh" trays (*Id.* at pp. 29-69, 52). On July 22, 2014, he complained that an inmate was stealing trays (*Id.* at p. 60). Jordan indicated the inmate stealing the trays threatened to stab inmates who complained about his actions. Jordan did not state the name of the inmate stealing trays (*Id.* at pp. 60-61).

### 3. *Investigation of the Assault*

Jordan did not report the assault until the next day (Doc. 137-2, pp. 69-70). He informed staff that he fell on the yard and injured his jaw (*Id*. at p. 70; 137-1, pp. 22, 69). In addition to his injured jaw, Jordan had bruising to his chest, forearms, and upper back, as well as scrapes on his arms (Doc. 137-2, p. 73; 137-3, p. 19). He was transferred to a local hospital and then to Deaconness Hospital in Evansville, Indiana, for a fractured jaw (Doc. 137-3, p. 16). Jordan underwent surgery to repair his jaw, which resulted in his jaw being wired shut (*Id*. at p. 8). Staff later discovered a note from an anonymous source indicating that Jordan was assaulted by Menter over the food tray issues (Doc. 141-2, p. 3).

Mark Deloia, a shift lieutenant and investigator, was assigned to investigate the incident (Doc. 140-1, p. 17). During the subsequent investigation, Menter refused to be interviewed, but photos documented abrasions to his hands and wrists (Doc. 140-1, pp. 24; Doc. 137-1, p. 25). Video footage of portions of the assault were reviewed as part of the investigation (Doc. 137-1, p. 27). Deloia testified that monitors for the video feed were housed in the lieutenant's office and the control room (Doc. 140-1, pp. 36-37). He testified that it was not possible to watch every camera in the institution 24/7, and there were no guards designated to watch videos (*Id*. at pp. 37-38). Christopher Davis, a captain at USP-Marion, stated that there were not enough personnel to always monitor cameras (Doc. 137-4, p. 2). Nor did a BOP regulation, program statement, or other directive require staff to be present in all areas of the prison or monitor all surveillance cameras (*Id*.). Similarly, Hill stated in her affidavit that due to the "distribution of resources in the form of manpower, officers cannot be in every location within the facility at all times."

Page 8 of 29

(Doc. 137-1, p. 3). She testified at her deposition that the monitors also record incidents, which can be retrieved and reviewed (Doc. 140-2, pp. 53-54). But no staff were solely responsible for monitoring cameras because "[t]hat's not a job assignment with the Bureau of Prisons." (*Id.* at p. 62). Nor did the prison have the manpower to always monitor every camera (Doc. 137-7, p. 17).

Because officers cannot be in all areas at once, they conduct irregular rounds throughout the unit and conduct searches of cells, common areas, and inmates (Doc. 137-4, p. 2; 137-7, pp. 13-14). Officers move throughout the unit frequently but cannot always oversee all activities in the unit (Doc. 137-4, p. 2). Davis testified that each officer is tasked with conducting five cell searches and five common area searches during a shift (Doc. 137-7, p. 17). But there is no written requirement that a specific common area or cell be searched at any given time (*Id.* at p. 18; 137-4, pp. 2-3).

### 4. *Surgery and After-Care*

After his surgery, Jordan testified that the surgeon informed him and the BOP that there was a risk he might throw up, which could cause Jordan to choke due to his jaw being wired shut (Doc. 137-2, p. 46). The hospital issued Jordan a pair of wire clippers in the event he had to release the wires in an emergency (*Id.*; Doc. 137-3, p. 8).

Jordan was placed in a cell in the SHU due to the lack of a long-term medical observation unit at Marion (*Id.*; Doc. 137-4, p. 3). Davis stated in his affidavit that although the medical unit has a place for inmates to be kept for short term observation, the unit lacks a location for an extended stay (Doc. 137-4, p. 3). Instead, inmates requiring long term observation are often placed in the SHU because it allows for more frequent contact

with officers (*Id.* at p. 4; Doc. 137-5, pp. 12-13). Davis stated that officers made rounds in the SHU twice per hour (Doc. 137-4, p. 4). Jordan testified that officers in the SHU made checks on the cells once an hour, and Jordan saw medical staff two or three times a day (Doc. 137-2, p. 47). Jordan also acknowledged that he received access to the clippers, which were chained to the bars of his cell (*Id.* at p. 46; Doc. 137-3, p. 8). Jordan feared that he would vomit if he took his medication and refused pain medication (*Id.* at p. 46; Doc. 137-3, p. 3). He testified that he believed he should have been placed under medical observation in a medical unit (Doc. 137-2, p. 46). Jordan remained in the SHU on medical observation for seven weeks (*Id.* at p. 47).

### 5.  *Jordan's First Amended Complaint*

On August 22, 2017, Jordan filed his Complaint (Doc. 1). He filed his First Amended Complaint in October 2018 (Doc. 16). Jordan's First Amended Complaint, as construed by District Judge J. Phil Gilbert, alleged that his assault was the result of his conditions of confinement, due to the housing of inmates of varying levels of aggression in the same unit without adequate security staff (Doc. 19, p. 2). Jordan further alleged after his injury and surgery, he was improperly placed in the unit's Special Housing Unit ("SHU") instead of the healthcare unit (*Id.*). After a merit review of the First Amended Complaint pursuant to 28 U.S.C. § 1915A, Jordan was allowed to proceed on the following claim:

> Count 1:     Defendant United States, by and through the negligence or deliberate indifference of the BOP Director and Unknown Staff at USP-Marion, CMU Officers, and USP-Marion Administrators is liable for Jordan's 2014 assault and resulting injuries under the FTCA.

Page 10 of 29

(*Id.* at p. 3).

Jordan identifies seven ways in which officials and staff at USP-Marion failed in their duty to protect him:

(1) Housing him in an open unit with higher security inmates, including an inordinate amount of Muslim gang members;

(2) Failing to provide reasonable measures to guarantee his safety;

(3) Failing to investigate and otherwise take action regarding his complaints about the Muslim gang members, their complaints about him, dangers in the unit, and issues with security;

(4) Failing to provide any level or means of protection just before and at the time of the incident;

(5) Failing to supervise inmate activity, enforce rules, and follow safety and security protocol;

(6) Housing mentally unstable, dangerous inmates in a general population unit; and

(7) Placing him in solitary confinement with his jaw wired closed without adequate supervision or any means to summon staff in an emergency.

(Doc. 192, p. 3)

## LEGAL STANDARDS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014), citing FED. R. CIV. P. 56(a). *Accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 900 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

### B. Federal Tort Claims Act

The FTCA permits suits against the United States for personal injuries caused by the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office of employment." *Arroyo v. United States*, 656 F.3d 663, 668 (7th Cir. 2011) (citing 28 U.S.C. § 1346(b)(1)). *See also Reynolds v. United States*, 549 F.3d 1108, 1112 (7th Cir. 2008) (FTCA allows claims for "personal injuries caused by the wrongful acts of federal employees acting within the scope of their employment under circumstances in which a private person would be liable to the plaintiff."); *Augutis v. United States*, 732 F.3d 749, 752 (7th Cir. 2013). The FTCA is a limited waiver of the Government's sovereign immunity that generally gives federal courts exclusive jurisdiction of civil actions on negligence claims against the United States. 28 U.S.C. § 1346(b)(1).

## C. Discretionary Function Exception

The United States moves for summary judgment, arguing, in part, that the acts complained of fall within the discretionary function exception to the FTCA. The FTCA is a limited waiver of the Government's sovereign immunity. But Congress crafted several exceptions to Section 1346(b)(1)'s waiver of immunity. 28 U.S.C § 2680(a); *see also Rothrock v. United States*, 62 F.3d 196, 198 (7th Cir. 1995) (no jurisdiction over cases involving discretionary function). One such exception is for claims arising from government acts and decisions that are based on considerations of public policy. *See United States v. Gaubert*, 499 U.S. 315, 322-23 (1991). This "discretionary function exception" provides that the Court has no jurisdiction over:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

"The discretionary function exception is an affirmative defense to liability under the FTCA that the government must plead and prove." *Keller v. United States*, 771 F.3d 1021, 1023 (7th Cir. 2014) (collecting cases). To fall within the discretionary function exception, the acts giving rise to the suit must meet two requirements: (1) the acts complained of must be discretionary in nature in that they involve an element of judgment or choice, and (2) the judgment exercised in the act must be the type of judgment that the discretionary function exception was designed to shield. *Gaubert*, 499

U.S. at 322-23; *Keller*, 771 F.3d at 1023.

To determine whether an act is discretionary because it involves an element of judgment or choice, the Court must examine the nature of the act, not the status of the actor. *Gaubert*, 499 U.S. at 322. A government employee does not exercise discretion when statutes, regulations, or policies dictate his or her conduct. In that situation, the employee has no rightful option but to conform his or her conduct to the rule, and there is no room for judgment or choice. *Gaubert*, 499 U.S. at 322. Thus, when an employee "deviates from a course of action prescribed by federal statute, regulation or policy, the employee's acts are not immune from suit." *Keller*, 771 F.3d at 1023. Second, the government also must show that the act was based on considerations of public policy. *Palay v. United States*, 349 F.3d 418, 428 (7th Cir. 2003). "With respect to the policy requirement, applicability of the exception depends not on the intent of the government actor but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.*

## ANALYSIS

The United States argues that it is entitled to summary judgment because Jordan's claims are barred by the discretionary function exception to the FTCA. In the alternative, the United States argues that there is no evidence of negligence in protecting Jordan from and investigating the assault, nor is there evidence of negligence in the care provided to Jordan after the assault.

### A. Discretionary Function Exception

The United States first argues that Jordan's claims are barred by the discretionary function exception. Specifically, the government argues that decisions regarding security and the protection of inmates falls within the discretionary function exception, thus barring all of Jordan's claims regarding the failure to protect him from Menter. The Government bears the burden of offering "evidence that shows beyond reasonable dispute that its conduct was shielded by the exception." *Keller*, 771 F.3d at 1023. The government is not always protected from liability for inmate violence; if "prison personnel violate a mandatory regulation, the exception does not apply because there is no room for choice and the action will be contrary to policy." *Id*. at 1024 (quotations and citations omitted).

### 1. *Jordan's Issues 1, 2, & 6*

Jordan first takes issue with his placement in the CMU with other inmates, which he argues were of a higher security classification for violent crimes and mostly Muslim gang members. He further argues that Menter was mentally ill, dangerous, and should not have been placed in the CMU with other, non-violent inmates like Jordan.

But placement in the CMU is at the discretion of BOP officials, and inmates may be designated to the CMU based on a number of criteria and considerations including: whether the current offense of conviction (1) includes association or communication related to international or domestic terrorism, (2) indicates a substantial likelihood that the inmate will act in furtherance of illegal activity by communicating with those outside the prison, (3) indicates a likelihood that the inmate will contact a victim or (4) the inmate

Page 15 of 29

misused approved communication methods while incarcerated or (5) there is evidence of a substantial threat to the prison or public as a result of inmate communication with persons in the community. 28 C.F.R. § 540.201(a)-(e). "Inherent in such placement … decisions are considerations of public policy such as concerns with security, cost, overcrowding, medical care, and the suitability of each facility to meet the needs of the prisoner." *Lipsey v. United States*, 879 F.3d 249, 255 (7th Cir. 2018).

Although Jordan argues that Section 540.201 was not promulgated when he was assigned to the CMU, Kathy Hill attested that the criteria and process were the same prior to the promulgation of the regulation (Doc. 137-1, p. 2). Further, Hill testified that both Jordan and Menter were designated through this process (*Id*.). *See also United States v. Jordan*, 591 F. Supp.2d 686, 700-04 (S.D.N.Y. Dec. 29, 2008) (Jordan was charged and convicted on counts of threatening interstate or foreign communications to kidnap or injure, threatening an internationally protected person, and interstate stalking, among other things). And, as the United States points out, there are no identified directives or regulations prohibiting the placement of differing security classifications in the same CMU (Doc. 137-1, p. 3). Deloia also testified that different security levels could be housed together (Doc. 140-1, pp. 32-33). Inmates could have different charges, sentences, and classifications and all be housed together in the same CMU (*Id*. at p. 35). Thus, the evidence demonstrates that officials exercised their discretion in placing both inmates in the CMU. Jordan's claims regarding his placement in the CMU and the placement of his attacker into the CMU are barred by the discretionary function exception. *See Sebolt v. United States*, 769 F. App'x 381, 382-83 (7th Cir. 2019) (placement of plaintiff into the

special housing unit was barred by the discretionary function exception); *Gaubert*, 499

U.S. at 324 (When policy, statute, regulation, or guidelines allow government "to exercise

discretion, it must be presumed that the agent's acts are grounded in policy when

exercising that discretion.").

### 2. *Issues 3, 4, and 5*

The United States also argues that Jordan's claims regarding the investigation of

complaints and failure to properly protect inmates in the CMU are also barred by the

discretionary function exception. Jordan argues that staff at the prison failed to

investigate his complaints and rising tensions in the unit, to properly monitor the unit

through searches and watching video surveillance, and to properly staff the unit.

The United States meets the first element of the discretionary function exception,

pointing out that there are no statutes, directives, or regulations regarding the number of

officers required in the CMU, the monitoring of video camera footage, or the

investigation of complaints about other inmates. *See McCoy v. United States*, 731 F. App'x

524, 526-27 (7th Cir. 2018) (discretionary function exception applied to decision to deny

protective custody after investigation); *Hill v. United States*, Case No. 13-cv-307-JPG-RJD,

2017 WL 3124736, at *3 (S.D. Ill. Jul. 24, 2017) ("Housing, lighting, security, and staffing

all fall within the broad discretion of prison administrators as they all involve an element

of judgment or choice…").

In his supplemental response, Jordan points to 18 U.S.C. § 4042 and PS 3420.11,

arguing that guards in the unit failed to properly monitor or staff the unit, and failed to

investigate "tensions" in the unit (Doc. 192, pp. 19-20, 26). But while Section 4042 provides

that the BOP "shall … provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses," the statute does not "direct the manner by which the BOP must fulfill this duty." *See* 18 U.S.C. § 4042(a)(2); *Calderon v. United States*, 123 F.3d 947, 950 (7th Cir. 1997). Jordan also points to PS 3420.11, which provides that employees "remain fully alert and attentive during duty hours." But the program statement does not provide any requirements for monitoring inmates either in person or by video footage, nor does it stipulate any requirements regarding investigations.[2] Thus, the United States has shown that decisions regarding staffing, monitoring inmates, and investigating complaints were discretionary acts.

But the United States also must meet the second element of the discretionary function exception, which requires the United States to demonstrate that the judgment exercised was based on considerations of public policy. *Gaubert*, 499 U.S. at 323. The exception is designed to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the

---

[2] In his *pro se* supplemental response and affidavit, Jordan argues for the first time that officers on duty later informed him that they were aware of the attack at the time of the incident but were unable to respond either due to inattentiveness or apathy (*See* Doc. 192-1, pp. 17-19; 189-2, p. 21). This is the first time that Jordan has raised this issue as a claim. These allegations were not raised in his First Amended Complaint (Doc. 16, pp. 6-7, 9-11; Doc. 19, p. 2), nor did Jordan raise the claim regarding inattentive guards as an issue in his deposition (Doc. 137-2, pp. 50-52). Jordan testified that he had not spoken to a guard who said they were watching the monitors, nor did he believe they were watching the monitors or saw the assault (*Id*. at pp. 51-52). He further testified at his deposition that guards told him they were waiting for backup (*Id*. at p. 51). His response and affidavit now state that one guard later told him he was aware "something was up" but the guard thought that Jordan could take care of himself, and another guard informed Jordan he was dozing (Doc. 192-1, pp. 17-18; Doc. 192, fn. at p. 19). This is contradictory to his prior testimony, and the Court disregards these statements from Jordan's affidavit. *See James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) ("[S]ham-affidavit rule prohibits a party from submitting an affidavit that contradicts a party's prior deposition or other sworn testimony").

medium of an action in tort." *Id*. (citations and quotations omitted). *See also Palay v. United States*, 349 F.3d 418, 432 (7th Cir. 2003) (An act of "carelessness would not be covered by the discretionary function exception, as it involves no element of choice or judgment grounded in public policy considerations."). "[I]f the record does not support a presumption that the officials exercised judgment, then the United States has not shown the applicability of the discretionary function exception." *Holmes v. United States*, Case No. 18-cv-00487-JMS-MJD, 2021 WL 2139078, at *4 (S.D. Ind. May 26, 2021) (citing *Palay*, 349 F.3d at 432).

Jordan argues, both in his *pro se* response and his former counsel's response, that officials at USP-Marion failed to exercise their discretion when they failed to investigate tensions in the unit, failed to adequately staff the unit, and failed to adequately monitor the video feed. According to Jordan, officials simply failed to act, making the discretionary function exception inapplicable.

### a.   Staffing and Monitoring

The United States has offered evidence that the decisions regarding staffing of the unit and monitoring of the video surveillance were an exercise of USP-Marion officials' judgment. As to staffing and physical monitoring, Kathy Hill stated that due to manpower, officers cannot always be in every area of the prison (Doc. 137-1, p. 3). Instead, staff make rounds of the unit. (*Id*. at p. 4). In Hill's experience, assaults or fights are often discovered after the fact because inmates wait until staff move to another part of the unit for rounds (*Id*.). Similarly, Captain Davis stated in his affidavit that the prison does not have the capability to see every part of the prison at the same time, and each officer is

assigned "post orders" for each shift, requiring them to move throughout the unit (Doc. 137-4, p. 2). Those duties include making irregular rounds throughout the unit, conducting searches of cells and common areas, and supervising inmate mealtimes and group activities (*Id.*). Officers move frequently throughout the unit and are not able to observe all activities (*Id.*). The video footage of the assault shows that no officers were in the area when the assault occurred, and there is no indication in the investigative report that officers were aware of the altercation (Doc. 137-1, pp. 3, 22-28).

Although Jordan makes much of the fact that Davis stated officers are expected to perform five cell searches and five common area searches during his or her shift, there is no written requirement that the officer perform a set number of searches (Doc. 137-4, pp. 2-3). Deloia testified that all areas of the unit, including the closet where Menter retrieved his weapon, were subject to random searches (Doc. 140-1, p. 47). Further, TRUScope records of common area searches show that common areas of the prison were being searched during the relevant time period (Doc. 137-4 at pp. 3, 5). The fact that two, as opposed to five, searches were conducted on the date of the assault does not negate the fact that officials utilized their discretion in determining what areas of the prison to search that date. Further, the mop closet where Menter retrieved his weapon had previously been searched by officers days before the attack (*Id.* at p. 5). The testimony and records demonstrate that officials were using their discretion to determine what areas of the prison to search on any given date (*Id.* at p. 5). The evidence further demonstrates that officials used their discretion in determining how to patrol the unit in order to best utilize their manpower.

Further, as to video surveillance, Captain Davis testified that video was for supplemental observation, to rerun or view something that happened earlier (Doc. 137-7, p. 5). Deloia similarly testified that video cameras had recording capability so that officials could go back and review the footage if an incident was reported (Doc. 140-1, p. 38). Video monitoring was not a requirement of the guards because video did not capture inside the cells and could not take the place of physical rounds (Doc. 137-7, pp. 4-6). There was never a requirement that the guards monitor the video feeds (*Id.* at p. 6). Captain Davis further stated in his affidavit that the video did not have the ability to see every assault or fight and there were not enough personnel to allow staff to monitor the cameras at all times (Doc. 137-4, p. 2). The evidence in the record makes clear that the decision not to monitor the video surveillance at the time of the assault was a discretionary decision which the prison exercised based on policy considerations.

### b. *Investigating Complaints*

The United States also maintains that its decisions regarding investigations of issues within the unit are subject to the discretionary function exception. The United States argues that decisions such as security fall within the discretion of the BOP, but in order to avail itself of the discretionary function exception, the United States must demonstrate that the officials exercised judgment. *See Palay v. United States*, 349 F.3d 418, 432 (7th Cir. 2003); *Pronin v. United States*, Case No. 2:15-cv-00183-JMS-DKL, 2017 WL 1021395, at * 4-5 (S.D. Ind. Mar. 16, 2017) (summary judgment denied when plaintiff informed officials about the threats and they failed to investigate); *Holmes*, 2021 WL 2139078, at * 5 (denying summary judgment when plaintiff asked not to be placed with a

certain inmate and there was no evidence officials exercised judgment in placing plaintiff over his objections). The United States cites to *Calderon* to support its position, but in that case, the Seventh Circuit determined from the pleadings that there was "no hint … that prison officials simply ignored the reported threats, or forgot about them." *Paley*, 349 F.3d at 432.

Here, there is evidence that Jordan and others raised complaints about tensions between Muslim inmates and other inmates in the unit, and there is no evidence to suggest that officials investigated those claims prior to the assault. Jordan testified that "there was always tension between the Muslim inmates and the white inmates" in the CMU (Doc. 137-2, p. 9). He also testified that the Muslim inmates took offense to prior statements he made about terrorists and the fact that he had a son in the military (*Id.* at pp. 34-35). And some Muslim inmates had requested that Jordan be moved out of the unit because they believed he did not like Muslims (*Id.* at p. 36). Jordan also wrote numerous copouts about various issues with Muslim inmates in the months leading up to the assault (Doc. 140-4, p. 27; Doc. 137-1, pp. 37, 47, 49, 52, 54, 62). Jordan complained about special privileges for Muslim inmates and issues with Muslim inmates taking food trays (*Id.*).

The United States argues that Jordan testified that he did not know why Menter attacked him, and any evidence to the contrary should be barred as contradicted by Jordan's sworn deposition testimony. Although Jordan testified that he did not know why Menter attacked him that day, he also testified that he believed another Muslim inmate put him up to it (Doc. 137-2, pp. 30-31, 33-34). Further, another inmate interviewed

during the investigation also indicated that another Muslim inmate encouraged the attack and that the attack was "Muslims up to no good." (Doc. 137-1, p. 26). An anonymous note found during the investigation also indicated that the assault was over issues with the Muslim inmates in the unit, specifically the issues with the food trays (Doc. 141-2). Thus, there is evidence beyond Jordan's sworn testimony that there were issues between Jordan and Muslim inmates in the unit.

And there is simply no evidence to suggest that any official at USP-Marion investigated those issues or made a decision to not investigate. Hill, the Intelligence Research Specialist ("IRS") at USP-Marion, testified as to the job of the IRS at the prison. Her job is to collect and analyze operational intelligence and conduct investigations of incidents (Doc. 140-2, pp. 11-12). She also reviewed copouts made by inmates (*Id*. at p. 14). She testified that it was the job of the IRS to investigate complaints, such as Jordan's complaints about Muslim inmates in the unit (*Id*. at pp. 14-15). Although acting as the current IRS, Hill testified that Henry Rivas was the IRS official before she took the position (*Id*. at p. 15). She further testified that if there were documented issues between groups of inmates, then the official would keep track of the issue and contact officers to further monitor the situation (*Id*. at pp. 16-17). But there is simply no evidence that Henry Rivas, the IRS prior to the assault, reviewed the complaints about issues in the unit, investigated the complaints, or decided to not investigate. Rivas retired in either October or November 2014, and there was no acting IRS just prior to, and at the time of, the assault on Jordan in December 2014 (*Id*. at p. 31). Further, Mark Deloia, the investigator who took over some of Rivas's investigative duties after his retirement, testified that he was not

aware of any problems with Muslim inmates harassing other inmates or stealing food trays (Doc. 140-1, pp. 53-54). And the United States has failed to offer any evidence that any official made determinations about whether to investigate the tensions in the unit, or whether they simply chose to ignore the issues. *See Pronin*, 2017 WL 1021395, at *5; *Holmes*, 2021 WL 2139078, at *5. Thus, the United States has failed to meet its burden of showing that the discretionary function exception applies to Jordan's claim that officials at USP-Marion failed to investigate growing tensions in the unit prior to the assault.

3.  *Issue 7*

The United States also argues that Jordan's claim of negligence for placing him in the SHU while his jaw was wired is barred by the discretionary function exception. Jordan argues that he should have been held in medical observation where he would have had more supervision and the ability to contact staff in an emergency. The Government points to PS 6031.04, Patient Care, which provides that institutions "may provide limited observation bed space." (Doc. 137-8, p. 10). The observation beds are only for "limited outpatient services for short stay inmates" and only for 72 hours (*Id*. at pp. 10, 12). There are no other statutes, regulations, or program statements regarding the placement of inmates for long-term observation, and Jordan has not identified any other requirements that he be housed in the healthcare unit.[3]  (Doc. 189, p. 29).

---

[3] Although Jordan points to PS 1600.13 and argues that the SHU was required to have a duress alarm, Jordan fails to attach the Program Statement or direct the Court to the document in the record (Doc. 192, p. 27). He merely points to his affidavit, which states that his cell lacked a duress alarm (Doc. 189-1, p. 21). A review of PS 1600.13 does not reveal any requirement that Jordan be housed in the healthcare unit after his surgery.

Further, Davis acknowledged in his affidavit that there were no locations for long-term medical care (Doc. 137-4, pp. 3-4). Instead, inmates needing long term observation were frequently placed in the SHU to allow for frequent contact with staff (*Id.*). Thus, USP-Marion's officials' decision to place Jordan in the SHU after his surgery was within the discretion of officials, and Jordan's claim is barred by the discretionary function exception.

Even if the decisions regarding placement and observation of Jordan after his surgery were not subject to the discretionary function exception, there is simply no evidence from which a jury could find that officials' placement of Jordan in the SHU amounted to negligence.

Under Illinois law, in order to recover for medical negligence, a plaintiff must demonstrate: (i) the applicable standard of care; (ii) that the medical providers deviated from that standard of care; and (iii) that the deviation from the standard of care was a proximate cause of the injury. *See Johnson v. Ingalls Memorial Hosp.*, 931 N.E.2d 835, 847 (5th Dist. 2010). A plaintiff must present expert testimony in order to establish these elements, as laypersons are generally not qualified to evaluate medical professional conduct. *See Addison v. Whittenberg*, 124 Ill.2d 287, 297 (1988).

Jordan maintains that he lacked the means in the SHU to contact staff in an emergency (Doc. 192, p. 25). He also argues that he was at risk of choking with a wired jaw but was placed in an "unstaffed" SHU behind two locked gates. But Jordan fails to offer evidence that these actions, even if true, amounted to medical negligence. Instead, he offers only his own opinions and fears that he had while housed in the SHU. And

Jordan fails to offer any expert testimony to state the applicable standard of care for individuals with wired jaws, and he has not offered testimony to suggest that staff at USP-Marion deviated from that standard of care. *See Addison*, 124 Ill.2d at 297. Jordan also fails to offer an affidavit from a health professional as required by statute. *See* 754 ILCS §5/2-622(a)(1); *Young v. United States*, 942 F.3d 349, 351 (7th Cir. 2019).

There is simply no evidence from which a jury could find that staff at USP-Marion were negligent in Jordan's care. Although placed in the SHU, there were frequent checks on his status by staff members. Captain Davis attested that officers in the SHU conducted rounds and checks on the inmates twice per hour (Doc. 137-4, p. 4). Benjamin Cullers, a registered nurse at USP-Marion at the time of Jordan's injury, also testified that individuals needing a higher level of monitoring were placed in the SHU because rounds were made more often in that unit (Doc. 137-5, pp. 12-13). Jordan testified that guards made rounds once an hour and he was seen by medical personnel two or three times a day (Doc. 137-2, p. 47). Jordan also acknowledged that he received a pair of wire clippers in case of an emergency (*Id.* at p. 46).

Although not housed in the medical unit, there is no evidence from which a jury could find that housing Jordan in the SHU amounted to negligence. Jordan argues that he should have been housed in a medical observation unit, but he offers no evidence that housing him in the medical unit was the applicable standard of care for his condition or that staff in any way breached that standard of care. Further, Jordan received monitoring and had access to emergency equipment while in the SHU. There is simply no evidence of negligence in Jordan's care after his surgery. Accordingly, the United States is entitled

to summary judgment on Jordan's claims regarding his medical care.

For the reasons stated, Jordan's claims regarding placement in the CMU, staffing and monitoring in the CMU, and his care in the SHU are barred by the discretionary function exception; his claims concerning the investigation of complaints in the CMU are not.

### B. Failure to Investigate

In the alternative, the United States also argues that Jordan's negligence claim for failure to protect him from assault fails on the merits. The Government argues that Jordan cannot demonstrate that officials at USP-Marion breached any duty or that any of their actions were the proximate cause of Jordan's injuries. The FTCA "incorporates the substantive law of the state where the tortious act or omission occurred." *Augutis v. United States*, 732 F.3d 749, 752 (7th Cir. 2013).

In Illinois, in order to prove an "action for negligence, the plaintiff must prove that the defendant owed a duty, that defendant breached that duty, and the defendant's breach was the proximate cause of injury to the plaintiff." *Am. Nat. Bank & Trust Co. of Chicago v. Natl. Advert. Co.*, 149 Ill.2d 14, 25 (1992). "Among the factors which [the] court has considered relevant to the existence of a duty are reasonable foreseeability, the likelihood of injury, and the extent of the burden placed upon the defendant in guarding against an injury." *Id.* at 26. "Foreseeability means that which it is *objectively reasonable* to expect, not merely what might conceivably occur." *Id.* at 29 (citations omitted). In a failure to protect case like the one raised by Jordan, the plaintiff "must show only that BOP staff knew *or reasonably should have known* of a potential problem between the two inmates."

*Parrott v. United States*, 536 F.3d 629, 637 (7th Cir. 2008) (citing *Brown v. United States*, 486 F.2d 284, 288–89 (8th Cir.1973) (analyzing United States's liability under the FTCA, in a federal inmate's failure-to-protect suit, in terms of what "the federal government knew or reasonably should have known")).

Simply put, like the analysis above with respect to the discretionary function exception as to the investigation of complaints in the CMU, there are issues of fact that prevent summary judgment on Jordan's failure to investigate claim. Although there is no evidence that Jordan specifically complained about Menter, construing the facts in the light most favorable to Jordan, there is evidence from which a jury could find that officials were made aware of tensions between Muslim inmates and Jordan. There is evidence that Jordan submitted copouts about issues with Muslim inmates, that Muslim inmates complained about Jordan, and that there were tensions in the unit between Muslim inmates and non-Muslim inmates. There is also evidence that the position in charge of investigating such complaints, the IRS, was vacant at the time of the assault. And Lieutenant Deloia, who took over some investigations in the IRS's absence, was unaware of conflicts in the unit.

Finally, there is evidence from which a jury could find that an assault was reasonably foreseeable. Viewing the evidence in the light most favorable to Jordan, there is evidence that the assault by Menter was a result of those uninvestigated tensions. There also is evidence in the investigation report from which a jury could find that the assault was the result of Jordan's complaints about food and other tensions with Muslim inmates in the unit (*See* Doc. 141-2, p. 3; 137-1, p. 26). As there are disputes of fact over whether

staff at USP-Marion were aware of and failed to investigate complaints in the unit, the Court finds that summary judgment is not appropriate on the merits of Jordan's claim regarding failure to investigate.

C<small>ONCLUSION</small>

For the reasons set forth above, Jordan's motion to accept admissions (Doc. 190) is **GRANTED**; Jordan's cross-motion for summary judgment (Doc. 193) is **STRICKEN**; the United States's motion for summary judgment (Doc. 137) is **GRANTED in part and DENIED in part**. Summary judgment is **DENIED** as to Jordan's claim that officials were negligent in failing to investigate or otherwise act regarding his complaints about Muslim inmates prior to the assault. The United States is **GRANTED** summary judgment on all other claims raised by Jordan related to his assault and care after the assault.

A status conference will be set by separate order to discuss the next steps to bring this case to resolution.

**IT IS SO ORDERED.**

**DATED:   September 29, 2023**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**